STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSURANCE v.
    NORTH CAROLINA RATE BUREAU, LIBERTY MUTUAL FIRE IN-
    SURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY,
    AETNA CASUALTY & SURETY COMPANY, AMERICAN MUTUAL
    LIABILITY INSURANCE COMPANY, STANDARD FIRE INSURANCE
    COMPANY, TRAVELERS INSURANCE COMPANY, LUMBERMENS
    MUTUAL CASUALTY COMPANY, UNITED STATES FIDELITY &
    GUARANTY COMPANY, AMERICAN MOTORISTS INSURANCE COM-
    PANY, FIDELITY & GUARANTY INSURANCE UNDERWRITERS,
    TRAVELERS INDEMNITY COMPANY, MARYLAND CASUALTY COM-
    PANY, TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND,
    PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COM-
    PANY

IN THE MATTER OF A FILING DATED OCTOBER 12, 1978, BY THE NORTH
    CAROLINA RATE BUREAU FOR REVISED WORKERS' COMPENSATION
    INSURANCE RATES DOCKET NO. 288

No. 74

(Filed 15 July 1980)

1. **Master and Servant § 80— workers' compensation insurance rates—unaudited data**

    The Commissioner of Insurance erred as a matter of law in concluding that unaudited data submitted in a workers' compensation rate filing was not reliable.

2. **Master and Servant § 80— workers' compensation insurance rates—income on unearned premium and loss reserves**

    The Commissioner of Insurance erred in concluding that underwriting profit should be reduced by an amount for theoretical investment income on unearned premium reserves and loss reserves in determining rates for workers' compensation insurance.

3. **Master and Servant § 80—workers' compensation insurance rates—investment income on invested capital**

    The Commissioner of Insurance erred in concluding that investment income on invested capital should be considered in determining rates for workers' compensation insurance.

4. **Master and Servant § 80— workers' compensation insurance rates—underwriting profit margin—use of capital asset pricing model**

    Use by the Commissioner of Insurance of a "capital asset pricing model" to calculate underwriting profit margins for workers' compensation insurance was erroneous as a matter of law.

5. **Master and Servant § 80— workers' compensation insurance rate hearing—testimony from prior unrelated hearing**

    The Commissioner of Insurance did not commit prejudicial error in a workers' compensation insurance rate hearing in admitting into evidence the

testimony of a witness given at a prior unrelated hearing concerning automobile insurance rates.

**6. Master and Servant § 80— workers' compensation rate hearing—burden of proof**

The burden of proof in a workers' compensation insurance rate hearing rests with the Rate Bureau.

**7. Master and Servant § 80— workers' compensation rates—use of expense experience of stock companies only**

Conclusion by the Commissioner of Insurance that proposed workers' compensation insurance rates were excessive because the expense allowance in the ratemaking formula was based solely on the experience of stock companies was unsupported by the evidence and erroneous as a matter of law.

**8. Master and Servant § 80— workers' compensation rate filing—no bad faith in failing to furnish certain data**

The Commissioner of Insurance erred in finding that the Rate Bureau acted dilatorily and in bad faith in not furnishing certain data pursuant to the notice of public hearing in a workers' compensation rate case.

Justice BROCK took no part in the consideration or decision of this case.

ON appeal as a matter of right pursuant to G.S. 7A-30(2) from the decision of the Court of Appeals, 44 N.C. App. 191, 261 S.E. 2d 671 (1979); one judge dissenting in part and *Chief Judge Morris* concurring specially, vacating and setting aside the order of the North Carolina Commissioner of Insurance dated 9 January 1979 which disapproved the 12 October 1978 filing by the North Carolina Rate Bureau in its entirety. The filing involved proposed revised premium rates, rating values and miscellaneous values for workers' compensation insurance.

The issues on this appeal all involve the propriety of the proceedings before the Commissioner and his order of 9 January 1979.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Isham B. Hudson, Jr. for the plaintiff-appellant.*

*Young, Moore, Henderson & Alvis by Charles H. Young and George M. Teague for defendants-appellees.*

CARLTON, Justice.

## I.

On 12 October 1978 the North Carolina Rate Bureau, on its own behalf and on behalf of its member companies writing workers' compensation insurance in North Carolina, filed with the North Carolina Commissioner of Insurance a proposed revised premium rate schedule for workers' compensation insurance. The filing also involved a proposed change in rating and miscellaneous values. The filing stated that statistical information substantiated the need for an average increase of 19.8% in the overall level of workers' compensation insurance rates and rating values presently enforced.

The Commissioner filed notice of public hearing on 14 November 1978 contending that the filing failed to comply with statutory and other requirements and was otherwise incomplete in a number of respects. After the hearing, the Commissioner made extensive findings of fact and conclusions of law and disapproved the filing in its entirety. From the Commissioner's disapproval order, the Rate Bureau appealed to the North Carolina Court of Appeals. That court, Judge Clark writing, vacated the Commissioner's order. Judge Arnold dissented on the limited ground that, in his view, there was substantial evidence to support the Commissioner's conclusion that unaudited data was not reliable. Chief Judge Morris, not a member of the panel in this case, concurred for the purpose of clarifying the holding of the Court of Appeals in that court's opinion in *State ex rel. Commissioner of Insurance v. North Carolina Rate Bureau*, 41 N.C. App. 310, 255 S.E. 2d 557, affirmed in part and reversed in part by our Case No. 85 filed today, pertaining to investment income on invested capital as a factor to be considered in ratemaking. Judge Erwin, who had dissented in an earlier opinion reversing the Commissioner's conclusion that unaudited data was not reliable, 44 N.C. App. 75, 259 S.E. 2d 926 (1979), filed a concurring opinion in the instant case stating that he found a "marked distinction compelling the vacating of the order in the instant case which did not appear of record" in the earlier case. 44 N.C. App. at 209, 261 S.E. 2d at 682.

While Judge Arnold's dissent was limited only to one question, in light of widespread public interest and the importance of

the issues here raised to the people of North Carolina, we exercise our supervisory and discretionary power and review all assignments of error and arguments presented to the Court of Appeals. As in the other three insurance ratemaking decisions we file today, in light of the magnitude of error in the Commissioner's order, we agree with the conclusion of the Court of Appeals that the order must be voided. We also order the filing approved and order the escrowed premium funds representing this proposed increase remitted to the member insurers pursuant to G.S. 58-124.22(b).

Other facts important to an understanding of our decision are noted below.

## II.

[1] The Court of Appeals held that the Commissioner erred as a matter of law in concluding that unaudited data submitted in a filing of this nature is not reliable. We affirm. This portion of our decision is controlled by Section II. of our decision in Case No. 85 filed today.

## III.

[2] The Commissioner found and concluded that underwriting profit should be reduced by an amount for theoretical investment income on unearned premium reserves and loss reserves. We disagree. This portion of our holding is controlled by Section V. A. of our opinion in Case No. 85 filed today.

## IV.

[3] The Court of Appeals held that the Commissioner erred in concluding that investment income on invested capital should be considered in a ratemaking hearing of this nature. We affirm. This portion of our decision is controlled by Section IV. of our opinion in Case No. 85 filed today.

## V.

[4] The Commissioner's conclusion of law No. 19 provided:

That the determination of underwriting profit margins should be calculated in accord with contemporary concepts of risk and return as understood in financial theory, specifically the capital asset pricing model as testified to by expert

witness Dr. William Bishop Fairley and detailed in the attached appendix the use of which theory and methodology in insurance rate-making has been upheld by the Supreme Judicial Court of Massachusetts.

We reverse. This portion of our decision is controlled by Section V. in our opinion in Case No. 85 filed today.

## VI.

[5] Appellees here argued before the Court of Appeals that the Commissioner erred in admitting into evidence the testimony of Dr. William Fairley at a prior unrelated hearing concerning automobile insurance rates. We have discussed this argument in Section VII. of our opinion in *State ex rel. Commissioner of Insurance v. North Carolina Rate Bureau*, Case No. 54, filed today and reaffirm that portion of our holding.

## VII.

[6] Appellees raise again on this appeal the question whether the burden of proof in a ratemaking hearing has been shifted to the Commissioner by virtue of changes made by the 1977 Legislature. We reaffirm our holding in Section VI. of our opinion in Case No. 85 filed today. The burden of proof, as that term is ordinarily understood in civil litigation, rests with the Rate Bureau in a ratemaking hearing of this nature.

## VIII.

[7] We next turn to the sole question presented on this appeal not presented in one of our three other insurance ratemaking decisions handed down today. In his findings of fact, the Commissioner stated:

10. That the expense allowance in the rate-making formula is based solely on the expense experience of stock companies.

11. That stock companies have greater expenses than other companies.

12. That using the expense experience of stock companies purportedly allows a margin for other companies to pay dividends.

13. That there has been no study conducted to determine the extent of a correlation, if any, between stock company ex-

penses and non-stock company dividends or whether the non-stock companies paid dividends during the period upon which the filing is based.

14. That the proposed rates are excessive due to basing the expense allowance in the rate-making formula solely on the expense experience of stock companies.

Based on the foregoing findings of fact, the Commissioner concluded as a matter of law, "That the proposed rates are excessive due to basing the expense allowance in the rate-making formula solely on the expense experience of stock companies when stock companies have greater expenses than other companies."

The Commissioner correctly argues that the record establishes that expenses for the operation of stock companies exceed that of mutual companies. The record also discloses that it is the use of stock company expenses which is employed in a ratemaking filing and not the lesser expense factor of the mutual companies. The Commissioner strenuously argues, therefore, that the use of stock company expense only creates a higher rate indication than if all expenses were combined equivalent to the composite of all the operating companies' actual expenses.

We think the Commissioner's conclusion from the quoted findings of fact, a portion of which are technically correct, is both unsupported by the evidence and erroneous as a matter of law.

The record discloses that insurance companies writing workers' compensation insurance in North Carolina are divided into two general categories, stock companies owned by stockholders and mutual companies owned by the policyholders. Stock companies market insurance through commissioned agents and do not pay dividends to policyholders. Mutual companies, on the other hand, generally do not have the personalized service of the insurance agent so that a reduction in commission and acquisition costs results. The difference between the premium paid and the actual cost of the insurance to the policyholder is returned by way of a dividend.

The witness Kallop, an actuary with an insurance service corporation, testified:

Only stock company expense experience was utilized because the manual rates are geared to stock company levels. These

rates are also applicable to mutual insurance companies as well, because the differences in the expenses between stocks and mutuals is used by the mutuals to grant dividends to policyholders. This is the same methodology utilized by the National Council in all the jurisdictions in which it makes rate filings.

The same witness testified on cross-examination:

The correlation of dividends paid out by mutual companies with the expenses of stock companies is shown in the insurance expense exhibit. There is a line there that refers to dividends to policyholders . . . . We are saying that the expense provisions were geared to stock company levels and that's the basis upon which the rates are based. I think that also the mutual companies who may have lower operating costs, that that differential and cost provides leverage so that they can give dividends to policyholders and, therefore, the use of rates geared to stock company expenses is also appropriate for the use by mutual carriers. *We determine that this was appropriate because of the fact that they do give dividends to policyholders and that the expense level of the stock companies gives them that leverage. We know that the mutual companies have indeed given dividends to policyholders.* The insurance expense exhibit tells you that. As to whether they relate to the expenses of stock companies, I think you can take that into account when you take their operating costs plus the dividend return. (Emphasis added.)

We note that the quoted testimony is undisputed in the record. The Commissioner's findings and conclusion to the contrary are therefore unsupported by material and substantial evidence in view of the entire record as contemplated by G.S. 58-9.6(b)(5). *See also* G.S. 150A-51(5).

As we noted in our opinion in Case No. 85 handed down today, we do not reject any portion of the Commissioner's order because it is novel or unprecedented. While the quoted testimony establishes that nearly all jurisdictions utilize the method presently employed in North Carolina, the head of an administrative agency in the executive branch of our government clearly has the power, provided he follows legal means, to chart new courses in discharging the functions of his office. Here,

however, the Commissioner has attempted to change a long-established approach on the spur of the moment and without proper foundation. It may well be, as the Commissioner's finding No. 13 suggests, that insufficient studies have been conducted with respect to the issue here involved. However, the Commissioner has explicit means at his disposal, pursuant to both our insurance and administrative procedure laws, to implement those studies.

Moreover, we note the practical aspect of the Commissioner's conclusion. Based on our understanding of the difference in stock and mutual companies which we glean from the record as noted above, it would appear that the consuming public has the choice between purchasing its insurance from a stock company with services for which the consumer is willing to pay and mutual companies with less services provided but at a lower premium. Clearly, the mathematics would indicate that the operating expense of the company providing additional services will be greater than the company which does not provide these services. The Commissioner's approach, at first glance, appears sound. If, as this Court has stated on numerous occasions, a filing by the Rate Bureau is to be considered a filing by a composite of all insurers, then why not take the average expense of all of them? The answer is that, with respect to the question here addressed, insurers are divided into two distinct and separate groups. More importantly, the result of the Commissioner's approach, it seems to us, would mean that a filing utilizing the average expense of all companies, both stock and mutual, would result in a lower industry-wide expense factor. However, at the same time the expense factor so utilized would result in an insufficient amount to cover stock company expenses, resulting in the inability of such companies to provide services apparently demanded by certain consumers. The expense factor so utilized with respect to mutual companies would, on the other hand, be artificially inflated in that it would reflect an expense factor not actually employed by the mutual companies. The present policy of refunding dividends to mutual company policyholders would undoubtedly be affected by this process. In other words, the present system provides the consuming public with a choice between purchasing its insurance from companies providing personal services at higher costs and those providing less service at a lower cost. This long-established

nationwide approach is entitled to more careful scrutiny than that provided by the Commissioner in the proceedings below.

This portion of the Commissioner's order is therefore reversed.

## IX.

[8] We also hold that the Commissioner erred in finding that the Rate Bureau acted dilatorily and in bad faith in not furnishing certain data pursuant to the notice of public hearing. This portion of our decision is controlled by our holding in Section IX. in Case No. 85 filed today.

## X.

Other issues were raised by the Rate Bureau in its appeal to the Court of Appeals but these issues were not specifically discussed by the Court of Appeals and have not been raised in the Commissioner-appellant's brief to this Court. All such issues are deemed abandoned, Rule 28(a), North Carolina Rules of Appellate Procedure.

## XI.

Accordingly, the decision of the Court of Appeals is

Modified and Affirmed.

As in Case No. 85, No. 86 and No. 54 filed today, it is apparent that the errors committed by the Commissioner in the proceedings below and the resulting order are of such magnitude as to make remanding for further proceedings futile. The order of the Commissioner dated 9 January 1979 is therefore

Reversed and declared null and void.

Accordingly, all escrowed premium funds representing this proposed rate increase pursuant to G.S. 58-124.22(b) shall be remitted to the member insurers forthwith.

It is so ordered.

Justice BROCK took no part in the consideration or decision of this case.