STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSURANCE, Appellee
v. NORTH CAROLINA RATE BUREAU, Appellant

IN THE MATTER OF THE FILING DATED MAY 1, 1995 AND AMENDED APRIL 1, 1996 BY THE NORTH CAROLINA RATE BUREAU FOR REVISED AUTOMOBILE INSURANCE RATES—PRIVATE PASSENGER CARS AND MOTORCYCLES

No. COA97-352

(Filed 16 June 1998)

## 1. Insurance § 400 (NCI4th)— automobile rates—investment income on capital and surplus—improper consideration

The Commissioner of Insurance erred by considering investment income on capital and surplus in his calculation of a fair and reasonable profit in an automobile insurance rate case where the Commissioner determined that a return on operations of 5.7% combined with the income from capital and surplus would result in a total return of 13% which is commensurate with the total return of businesses of comparable risk.

## 2. Insurance § 403 (NCI4th)— automobile rates—values for dividends and rate deviations

The Commissioner of Insurance did not fail to reflect expected values for policyholder dividends and rate deviations in an automobile rate case where the Commissioner found that the average rate already included a provision for dividends and deviations of approximately 5% of the premium; that because an average rate is used, some companies will do better than average and others will not; that those who do better will be able to grant div-

idends and deviations of up to 5% of the premium; and that the 5% of premium will generate $100 million, which is a reasonable and adequate amount. N.C.G.S. § 58-36-10(2).

**3. Insurance § 403 (NCI4th)— automobile rates—underwriting profit—statutory accounting practices**

The Commissioner of Insurance had the discretion to use Statutory Accounting Practices rather than Generally Accepted Accounting Principles in establishing underwriting profit provisions in an automobile insurance rate case.

**4. Insurance § 403 (NCI4th)— automobile insurance—underwriting profit—normative premium-to-surplus ratio**

The Commissioner of Insurance did not err by using a normative 2 to 1 premium-to-surplus ratio rather than the Rate Bureau's historical ratio of 1.75 to 1 in calculating underwriting profit provisions in an automobile insurance rate case where the historical 1.75 to 1 ratio was based on the 1994 countrywide all-lines ratio rather than a ratio limited to North Carolina and to automobile insurance, and evidence was presented showing that the North Carolina automobile insurance industry experienced less risk than the automobile insurance industry in general so that a higher ratio which allocates fewer assets to cover the risk of loss would be appropriate.

**5. Insurance § 400 (NCI4th)— automobile rates—underwriting profit—tax rate for investment income**

The Commissioner of Insurance did not err in adopting a 20% effective tax rate for investment income in determining underwriting profit in an automobile insurance rate case, although the Rate Bureau calculated an effective tax rate of 24.37% for investment income based upon anticipated taxes on the actual investment portfolio held by the industry in 1994, where there was no certainty that the 1994 portfolio would be the same as the actual portfolio in 1997, the period for which the prospective rates were set; the Commissioner's rate was prospective and based on a mix of tax-exempt and taxable securities which Department experts considered relevant and appropriate; and the portfolio mix used by the Rate Bureau to calculate its 1994 effective tax rate was based on data for the countrywide property and casualty industry and may not reflect the mix of assets attributable to the North Carolina automobile insurance industry.

Judge GREENE dissenting in part.

Appeal by the North Carolina Rate Bureau from orders entered 4 October 1996 and 31 October 1996 by the North Carolina Commissioner of Insurance. Heard in the Court of Appeals 7 January 1998.

*North Carolina Department of Insurance by Kristin K. Eldridge and Sherri L. Hubbard for appellee Commissioner of Insurance.*

*Young Moore and Henderson P.A. by R. Michael Strickland, William M. Trott, Marvin M. Spivey, Jr., and Terryn D. Owens for appellant North Carolina Rate Bureau.*

MARTIN, Mark D., Judge.

On 1 April 1996, amending its 1 May 1995 filing, the North Carolina Rate Bureau (Bureau) filed a request to increase automobile insurance rates. Included was a request to increase rates for private passenger car insurance by 5.7% and motorcycle insurance by 10.1%. The North Carolina Insurance Commissioner (Commissioner) conducted hearings beginning 9 July 1996 and concluding 20 August 1996. The Commissioner heard testimony from five Department of Insurance (Department) expert witnesses and six Bureau experts and received 61 Department and 87 Bureau exhibits into evidence. The hearing transcript was approximately 3600 pages in length. By orders dated 4 October 1996 and 31 October 1996 the Commissioner disapproved the proposed rate changes and instead ordered a rate reduction for cars of -8.3% and a rate increase for motorcycles of 3.2%. From these orders, the Bureau appeals.

In reviewing orders of the Commissioner we must examine the whole record and determine whether the Commissioner's conclusions of law are supported by material and substantial evidence. *State ex rel. Comr. of Ins. v. N.C. Rate Bureau*, 124 N.C. App. 674, 678, 478 S.E.2d 794, 797 (1996), *disc. review denied*, 346 N.C. 184, 486 S.E.2d 217 (1997). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . [but] more than a scintilla or a permissible inference." *Id.* (citations omitted). When there is conflicting evidence in the record, it is not this Court's function to substitute its judgment for that of the Commissioner, since the "weight and sufficiency of the evidence as well as the credibility of the witnesses are determined by the Commissioner." *Id.* (citing *State ex rel. Comr. of Insurance v. N.C. Rate Bureau*, 96 N.C. App. 220, 221, 385 S.E.2d 510, 511 (1989)). Any order of the Commissioner that is supported by substantial evidence is presumed correct, N.C. Gen. Stat. § 58-2-80 (1994), and the rates

fixed by the Commissioner's order are *prima facie* correct. N.C. Gen. Stat. § 58-2-90(e) (1994).

## I.

**[1]** The Bureau first contends the Commissioner erred as a matter of law by considering investment income on capital and surplus in his ratemaking calculations. Specifically, the Bureau alleges that the Commissioner improperly "reduc[ed] his target return from a return equal to industries of comparable risk to a return on operations alone" and as a result impliedly considered the invalid information in his calculation.

North Carolina law requires that regulated insurance rates be adequate to provide the industry a fair and reasonable profit. *Comr. of Insurance v. Rating Bureau*, 292 N.C. 471, 483, 234 S.E.2d 720, 726 (1977). The ultimate question for the Commissioner's determination is whether the proposed rates will, after provision for reasonably anticipated losses and operating expenses, leave the insurers a fair and reasonable profit and no more. *Id.* Determining a fair and reasonable profit "involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk." *In re Filing by Fire Ins. Rating Bureau*, 275 N.C. 15, 39, 165 S.E.2d 207, 224 (1969).

Insurance companies derive their returns from two branches of the insurance business—returns generated by the profits earned by insurance operations including investment income on reserves, and returns generated by the profits earned by investing capital and surplus funds. *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 446, 269 S.E.2d 547, 587, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 300 (1980). In order to make a comparison with industries of comparable risk, the Commissioner attempted to combine these two branches and compare this total return of the insurance industry to total returns of other industries. When setting insurance rates, however, income from invested capital and surplus cannot be considered. *Id.* at 444, 269 S.E.2d at 586. This fundamental rule is justified, at least in part, because "the required capital assets of a casualty insurance company are primarily reserves to guarantee its ability to discharge its liability rather than for use as working capital in the prosecution of its business." *Id.* at 442, 269 S.E.2d at 585 (citations omitted). Accordingly, a fair and reasonable profit must be calculated without considering investment income from capital and surplus while considering the returns of businesses of comparable risk.

In *State ex rel. Comr. of Ins. v. N.C. Rate Bureau*, 124 N.C. App. at 685, 478 S.E.2d at 802, the Commissioner used a methodology that included a line item and calculation for "Income from Capital and Surplus." We remanded his order for recalculation using a formula that excluded investment income earned on capital and surplus. *Id.* at 685-686, 478 S.E.2d at 802. The Commissioner's attempt to distinguish his present methodology is unpersuasive.

In his brief, the Commissioner explains that in the earlier case he found the target total return of the insurance industry based on the total returns of industries of comparable risk. He then subtracted the investment income on capital and surplus from this total return and arrived at a total return on insurance operations. This return on operations was used to derive the profit provisions.

In the present case, the Commissioner started with a direct estimate and justification of the return on operations, rather than a total return, and derived his profit provisions from this estimated return on operations without explicitly including investment income from capital or surplus in his calculations.

The Bureau argues that the Commissioner simply "repackaged" his calculations by starting with a return on operations as his target in order to avoid the appearance of explicitly considering investment income on capital and surplus, but in essence accomplished exactly what we have previously disallowed. We agree.

The Commissioner admits in his brief that his 5.7% "return on operations may be tested to ensure that it will result in a 'total return' commensurate with the 'total return' of businesses of comparable risk by adding the income from capital and surplus to the return on operations." Indeed, the Commissioner further acknowledges he "performed this test and determined that the return on operations of 5.7% combined with the income from capital and surplus would result in a 'total return' of 13%, which is in the range of returns earned by other industries."

We are bound by the decisions of our Supreme Court and must reject the Commissioner's creative attempt to deviate from such precedent. *Mahoney v. Ronnie's Road Service*, 122 N.C. App. 150, 153, 468 S.E.2d 279, 281 (1996), *aff'd per curiam*, 345 N.C. 631, 481 S.E.2d 85 (1977). Therefore, we hold that the Commissioner improperly considered income from capital and surplus in arriving at his total return and remand for recalculation.

## II.

[2] The Bureau next contends the Commissioner improperly failed to reflect expected values for policyholder dividends and rate deviations in his rate calculations and consequently ordered rates that do not comply with statutory requirements. Specifically, the Bureau argues that dividends and deviations must be explicitly reflected in calculating rates and not classified as profit.

In his order, the Commissioner stated:

The argument between the parties, pared down to its simplest form, is whether the prospective rate level should be determined by the actual revenue retained by insurers at the end of the period or whether the prospective rate level should be set without regard to the discretionary collection and retention of premiums by insurers. In other words, the question is whether insurers' profit is the amount they have left after they have granted deviations and paid out policyholder dividends or whether insurers' profit is measured to include deviations and policyholder dividends.

The Commissioner found the average rate already included a built-in provision for dividends and deviations of approximately 5% of the premium and that the Bureau's attempts to apply an additional rate increase for the explicit purpose of paying dividends and deviations would lead to an upward spiral in rates by essentially counting these factors twice.

North Carolina law requires "a uniform premium rate schedule for all companies operating in the State." *In re Filing by Fire Ins. Rating Bureau*, 275 N.C. at 32, 165 S.E.2d at 219. "For rate making purposes, the Bureau is to be regarded as if it were the only insurance company operating in North Carolina and as if it had . . . experience, . . . equivalent to the composite of the companies actually in operation." *Id.* In setting this average schedule "due consideration" must be given to dividends and deviations in ruling on the rate request. N.C. Gen. Stat. § 58-36-10(2) (1994).

As previously stated by this Court, " 'due consideration' does not mandate that a numerical adjustment to the rates must be made to reflect the effects of dividends and deviations." *Comr. of Ins.*, 124 N.C. App. at 681, 478 S.E.2d at 799. N.C. Gen. Stat. section 58-36-10 only requires that the Commissioner give 'due consideration' to rating criteria such as dividends and deviations. " 'Nothing in the language

of the statute requires that the Commissioner provide for [dividends and deviations] so long as the rate level established on the statutory rate criteria is not inadequate, excessive, or unfairly discriminatory.' " *Id.* at 681-682, 478 S.E.2d at 799 (quoting *State ex rel. Comr. of Insurance v. N.C. Rate Bureau,* 75 N.C. App. 201, 224-225, 331 S.E.2d 124, 141, *disc. review denied,* 314 N.C. 547, 335 S.E.2d 319 (1985). "[T]he General Assembly never intended 'to make any one, or all, of these matters [statutory rating standards] conclusive. . . . The weight to be given the respective factors is for the Commissioner to determine in the exercise of his sound discretion and expertise. . . .' " *Id.* at 682, 478 S.E.2d at 799 (quoting *Comr. of Insurance,* 75 N.C. App. at 225, 331 S.E.2d at 141).

Accordingly, the Bureau's argument that dividends and deviations be explicitly reflected in the Commissioner's calculation is unfounded. The Commissioner need only give 'due consideration' to these factors and arrive at a rate that will leave insurers with a fair and reasonable profit. *Id.* at 682, 478 S.E.2d at 799-800. The Bureau's contention that dividends and deviations be reflected as an expense, rather than in the margin for underwriting profit, has been rejected by this Court. *Id.* at 682, 478 S.E.2d at 800. Although we so held, we remanded the case to allow the Commissioner to make more specific findings showing the facts upon which he based his decision that the rate contained a 4.96% margin for dividends and deviations. *Id.* at 684, 478 S.E.2d at 801. In the present case, the Commissioner concluded that the rate contained a 5% margin. In his order he found

> [u]sing the historical results in the evidence supplied by the Bureau, it appears that a reasonable margin has been included in prior rates for the accumulation of surplus for the payment of dividends and deviations even without the extra explicit expense load provision for dividends and a reduction in manual premiums for deviations, as set forth in this filing. These margins were provided by an average manual premium. The provision for dividends and deviations contained within the average manual rate is approximately 5% of premium. This value is based upon the various savings for insurance companies related to losses and expenses that are lower than the average value contained in the manual rates. The Commissioner finds and concludes that any margin for the payment of dividends and deviations in excess of the margin provided for in the average manual premium is unreasonable and produces rates that are excessive and unfairly dis-

criminatory. Based on the foregoing, the Commissioner finds that a profit provision of -4.0% for liability and +1.6% for physical damage will provide approximately 5% of manual premiums, or approximately $100 million, that may be paid as a dividend and/or deviated as a savings to insureds, assuming the same book of business. The approximately 5% of premium or approximately $100 million provided in the average manual rate for policyholder dividends and deviations is reasonable, adequate and is provided in the rates which are adopted and approved hereinafter by this Order and which are not inadequate, excessive, or unfairly discriminatory.

We conclude there is substantial evidence to support the Commissioner's findings regarding dividends and deviations. In the words of one Department expert:

At all times there are some more efficient and some less efficient companies in any market. Under North Carolina ratemaking procedures, rates reflect average expenses. This "penalizes" inefficient high cost companies and encourages them to improve. At the same time it provides "rewards" to efficient low cost companies, which allows them to provide dividends and deviations to attract and retain new policyholders. If these dividends and deviations were allowed to become a rate increment for all companies, that would undermine the economic incentives of this "penalty-reward" system. If companies use their efficiency "rewards" to fund deviation and dividend programs to attract policyholders, and those dividends and deviations are subsequently added as an additional increase in computing new rates, the resulting new, higher rates would generate even larger profits, thus providing a basis for larger dividends and deviations and, as a result, even higher rates and so on. Under such a procedure, the connection between actual requirements (to cover losses and expenses) and allowed rates would quickly deteriorate and rate regulation would become a pointless exercise.

When asked to explain how manual rates based on average cost projections allow insurance companies to use deviations and dividends, another Department expert stated:

There are a number of sources within an average rate that allow individual insurance companies to use deviations and dividends. These sources include: (1) Expected losses for individual insurance companies that are lower than average, (2) Expected

expenses for individual insurance companies that are lower than average, (3) A particular insurance company willing to accept a lower than expected average profit, (4) The actual aggregate experience for a period turning out to be more favorable than expected, and (5) The cost projections underlying the manual rates being favorable towards insurance companies.

Having reviewed the provision for deviations and dividends contained within a manual rate based upon average cost projections, the expert stated that based on several of these factors "the provision for deviations and dividends contained within the average rate level is about 5% of premium. This value is based upon the various savings for insurance companies related to losses and expenses that are lower than the average value contained in the manual rates."

In essence, the Commissioner found that because an average rate is used, some companies will do better than average and others will not. Consequently, those who do better will be able to grant dividends and deviations of up to 5% of premium. Based on the historic figures provided by both parties and future projections, the 5% of premium will generate approximately $100 million, which the Commissioner concluded is a reasonable and adequate amount. After careful review of the record and the arguments contained therein, we do not believe the Commissioner erred in his findings and conclusions.

III.

Finally, the Bureau contends the Commissioner erred in ordering underwriting profit provisions that ignore the actual structure of the insurance industry and will not generate a fair and reasonable profit. Specifically, (A) the Commissioner gave the industry a return on only a portion of its assets by applying his selected target return to the industry's statutory surplus rather than its net worth and by using a hypothetical premium-to-surplus ratio instead of the actual rate; and (B) the Commissioner erred in assuming an effective tax rate on investment income inconsistent with the makeup of the industry's actual investment portfolio.

A.

[3] First, the Bureau contends the Commissioner's rates provided his target return on only a portion of the industry's assets. It argues the Commissioner established underwriting profit provisions designed to give the insurance industry a return on its statutory surplus—the measure of the industry's equity under Statutory Accounting

Practices (SAP), rather than the more appropriate Generally Accepted Accounting Principles (GAAP).

> The Commissioner is considered an expert in the field of insurance and his reliance on various methods of analysis of the profit to which the insurance companies are entitled lies entirely within his discretion. . . . We find there is substantial and material evidence to support the Commissioner's use of SAP in calculating the profit provisions. Not only was there expert testimony that SAP was the appropriate method, but as the Commissioner pointed out in his order, even our statutes refer to the accounting practices set forth by the NAIC (i.e. SAP system) in requiring insurance companies to evaluate and make regular reports of their financial positions. Additionally, the Commissioner reasons that since SAP represents that level of financial commitment an insurance company is legally required to make to its policyholders, it is a logical foundation upon which to base a rate of return in determining "a fair and reasonable profit and no more." "As we do not find error in the Commissioner's judgment we cannot replace our judgment for his."

*Comr. of Ins.*, 124 N.C. App. at 687-688, 478 S.E.2d at 803 (citations omitted).

In the present case, the Commissioner made similar findings justifying his decision to use SAP rather than GAAP. We find the Bureau's attempts to distinguish the present situation unpersuasive.

[4] The Bureau also argues the Commissioner improperly used a hypothetical premium-to-surplus ratio that further reduced the industry's asset base. It contends there was no evidence the actual premium-to-surplus ratio for companies writing auto insurance in North Carolina would be greater than 1.75 to 1, and by using the hypothetical 2 to 1 ratio, the Commissioner assumed the companies had less surplus than they actually did and thereby allowed a return on only a portion of the industry's assets.

> We have previously held

> there was substantial evidence to support the Commissioner's selection of a 2 to 1 premium-to-surplus ratio. The 2 to 1 ratio is a traditional standard for the premium-to-surplus ratio and several expert witnesses used this 2 to 1 ratio in their calculations. Additionally, there was testimony that it is more appropriate to use a normative ratio than an historical one when determining

rates on a prospective basis. We agree with the Commissioner there is no evidence of error as a matter of law; there is neither a statutory mandate for a premium-to-surplus ratio nor anything to preclude the Commissioner's use of a hypothetical normative premium-to-surplus ratio as opposed to the actual ratio so long as there is substantial evidence to support the Commissioner's selection.

*Id.* at 691, 478 S.E.2d at 805. Similar evidence was presented to the Commissioner in the present case. In addition, several experts testified that the 2 to 1 ratio was appropriate. The Bureau's historical ratio of 1.75 to 1 was based on the 1994 countrywide all-lines ratio, rather than a ratio limited to North Carolina and to automobile insurance. There was no guarantee such a ratio would reflect the future allocation of surplus to the North Carolina automobile insurance line. Evidence was also presented showing that the North Carolina automobile insurance industry experienced less risk than the automobile insurance industry in general, and consequently, a higher ratio which allocates fewer assets to cover the risk of loss would be appropriate. As in our prior decision, we hold there is material and substantial evidence to support the Commissioner's use of the normative ratio.

## B.

[5] Finally, the Bureau argues the Commissioner erred in adopting a 20% effective tax rate for investment income. In its filing, the Bureau calculated an effective tax rate of 24.37% for investment income based upon the taxes it anticipated paying on what it contended was the actual investment portfolio held by the industry. The 20% figure, according to the Bureau, was assumed by the Commissioner to be the effective tax rate, and failed to account for the actual investment portfolio of the industry.

Although the record reflects that the investment portfolio used by the Bureau to calculate its tax rate was the actual portfolio for the industry in 1994, there was no guarantee it would be the actual portfolio in 1997, the period for which the prospective rates were set. The Commissioner's rate, on the other hand, was prospective and based on a mix of tax-exempt and taxable securities which Department experts considered relevant and appropriate. In addition, it appears the portfolio mix used by the Bureau to calculate its 1994 effective tax rate was based on data for the countrywide property and casualty industry, which may not reflect the mix of assets attributable to the North Carolina automobile insurance industry.

STATE Ex Rel. COMM'R OF INS. v. N.C. RATE BUREAU

[129 N.C. App. 662 (1998)]

The Bureau cites *Comr. of Insurance*, 300 N.C. at 450-451, 269 S.E.2d at 589-590, as authority for its contention that the Commissioner is required to make rates for the industry as it actually exists. The holding in that case, however, was based upon a statutory mandate that the insurance industry invest in certain types of securities which, in setting the prospective rates, created a certainty that the investment portfolio of the future would include only those types of securities dictated by statute. *Id.* Former N.C. Gen. Stat. section 58-79.1 required insurance companies to invest their funds in certain designated stocks. *Id.* at 450, 269 S.E.2d at 589. The Court concluded that it could not have been the legislative intent to require investments in designated securities only "and then require that . . . underwriting profits shall be computed on the hypothetical assumption that they were invested in something else." *Id.* at 450-451, 269 S.E.2d at 589-590. In the present action, there was no certainty as to the proportion of taxable and tax-exempt securities that the industry would hold, and, therefore, the "actual" investment portfolio of 1994 upon which the Bureau's tax rate was based need not have been the investment portfolio attributable to the North Carolina automobile insurance line in 1997. Accordingly, we conclude the Commissioner did not err as a matter of law in establishing an effective tax rate of 20%, and his decision was supported by material and substantial evidence.

We have carefully reviewed the Bureau's remaining assignments of error and find them to be without merit.

Affirmed in part, reversed in part, and remanded.

Judge JOHN concurs.

Judge GREENE dissents in part with separate opinion.

Judge GREENE dissenting in part.

I do not agree with the majority that the "Commissioner improperly considered income from capital and surplus in arriving at his total return" and that remand is necessary for a recalculation of the automobile insurance rates. Otherwise, I fully concur with the majority.

The issue raised in this appeal is how the Commissioner is to calculate a fair and reasonable profit provision for automobile insurance companies.

The parties do not dispute and our courts have long recognized that the "insurance business is divided into two separate and distinct branches, (1) the underwriting business and (2) the investment business." *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 446, 269 S.E.2d 547, 587, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 300 (1980). The North Carolina Rate Bureau (Bureau) contends that the law of this State requires automobile insurance rates to be established so that insurance companies receive a profit on their underwriting business that is equal to the total profit received by other industries of comparable risk. The North Carolina Insurance Commissioner (Commissioner) argues that the establishment of automobile insurance rates in the manner suggested by the Bureau would be inconsistent with the laws of this State and would "provide insurance companies with a return in excess of the returns earned by industries of comparable risk and will result in excessive rates." I agree with the Commissioner.

Automobile insurance rates must be "adequate to produce a fair and reasonable [underwriting] profit."[1] *Id.* at 443, 269 S.E.2d at 585 (quoting *Comr. of Insurance v. Attorney General*, 16 N.C. App. 724, 729, 193 S.E.2d 432, 435 (1972)). The question of whether the rate is "fair and reasonable" is a question of fact for the Commissioner which "involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk." *In re Filing by Fire Ins. Rating Bureau*, 275 N.C. 15, 39, 165 S.E.2d 207, 224 (1969).

In this case, the Commissioner determined that a 5.7 percent return on an automobile insurance company's underwriting business was a fair and reasonable profit provision. After making that determination, the Commissioner "tested" his decision by comparing the 5.7 percent return on underwriting with the total return (underwriting and investments) of other businesses of comparable risk. In making that comparison the Commissioner determined that the 5.7 percent return on underwriting when combined with return on investments of the insurance companies amounted to a total return for the insurance company within the range of the total return received by other businesses of comparable risk.

The procedure used by the Commissioner complies, as best as possible, with the somewhat conflicting directives of our courts:

---

1. Because the rate must provide a fair return on the underwriting business, return on investments held by the insurance company are not to be considered. *Comr. of Insurance*, 300 N.C. at 444, 269 S.E.2d at 586.

(1) set rates so as to produce a fair and reasonable profit on the *underwriting* portion of the automobile insurance business, and (2) set rates so as to provide the insurance company a profit consistent with profits from other businesses of comparable risk. The conflict in these directives arises because the profits from other businesses of comparable risk are usually not divided into underwriting and investments. Thus, to set the underwriting rates as suggested by the Bureau, consistent with other businesses, allows the automobile insurance company a return on its *underwriting* business equal to the *total* return of businesses of comparable risk. When that *underwriting* return is added to the return the insurance companies receive on their investments, they receive a return in excess of that received by comparable companies. For example: assume that the total return received by comparable companies is 13 percent. If automobile insurance rates are established so as to provide the insurance company with an *underwriting* return of 13 percent, and the insurance company is also receiving a return of 7 percent on its *business investments*, then the total return for the insurance company would be 20 percent, an amount substantially in excess of the 13 percent total return of other comparable businesses. I simply do not believe that this result represents either the intent of our legislature or a proper construction of our case law.

I would, therefore, affirm the order of the Commissioner.