STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSURANCE, APPELLEE
v. NORTH CAROLINA RATE BUREAU, APPELLANT

IN THE MATTER OF THE FILING DATED MAY 1, 2001 BY THE NORTH CAROLINA
RATE BUREAU FOR REVISED AUTOMOBILE INSURANCE RATES—PRIVATE
PASSENGER CARS AND MOTORCYCLES

No. COA02-891

(Filed 7 October 2003)

**1. Insurance— ratemaking process—automobile and motor-cycle liability insurance—investment income from capital and surplus funds—return on insurance operations**

The Commissioner of Insurance did not improperly consider investment income from capital and surplus funds while calculating the ordered automobile and motorcycle liability insurance rates, because: (1) the Commissioner focused on the return on insurance operations as the appropriate target for his calculations; (2) the evidence regarding the eighteen year average return on insurance operations is more than a scintilla or a permissible inference that sufficiently supports the Commissioner's setting of rates; and (3) the Commissioner is not required to set his target as the total rate of return.

**2. Insurance— ratemaking process—automobile and motor-cycle liability insurance—policyholder dividends—rate deviations**

The Commissioner of Insurance did not fail to give due consideration to the impact of policyholder dividends and rate deviations in his ratemaking calculations for the ordered automobile and motorcycle liability insurance rates, because: (1) the ratemaking formula is not required to contain an explicit adjustment for dividends and deviations in order to prove due consideration was given to them; (2) dividends and deviations should not be added to the rate since they are already included within the computation of the average rate; (3) dividends and deviations are part of profit and a provision for profit already exists; and (4) although the Commissioner analyzed this issue from the average insurance company, his conclusions and findings also discussed the effect of the average rate on the industry and the overall aggregate profit of the industry.

**3. Insurance— ratemaking process—automobile and motorcycle liability insurance—investment income from policyholder-supplied funds**

The Commissioner of Insurance did not improperly calculate the investment income available from policyholder-supplied funds in its ratemaking calculations for the ordered automobile and motorcycle liability insurance rates, because: (1)if rate deviations were also considered within the investment income from policyholder-supplied funds portion of the equation, deviations would be counted twice; and (2) agents' balances and prepaid expenses were within the control of the individual insurance companies and should not impact the ratemaking process in a way that disadvantages consumers.

**4. Insurance— ratemaking process—automobile and motorcycle liability insurance—excessive, inadequate, or unfairly discriminatory rates**

The Commissioner of Insurance did not err by substituting its ratemaking procedure without first finding that the North Carolina Rate Bureau's procedure would produce excessive, inadequate, or unfairly discriminatory automobile and motorcycle liability insurance rates, because: (1) the Commissioner is not required to find each portion of the Bureau's filing improper before he can substitute his own ratemaking structure; and (2) in order to use his own data or calculations or to set rates, the Commissioner must only conclude that the Bureau's filing as a whole would result in excessive, inadequate, or unfairly discriminatory rates.

Judge TYSON dissenting.

Appeal by North Carolina Rate Bureau from order entered 14 December 2001 by the North Carolina Commissioner of Insurance. Heard in the Court of Appeals 10 June 2003.

*Young, Moore and Henderson, P.A., by R. Michael Strickland, William M. Trott, Marvin M. Spivey, Jr. and Terryn D. Owens, for appellant.*

*North Carolina Department of Insurance, by Sherri L. Hubbard and Stewart L. Johnson, for appellee.*

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

EAGLES, Chief Judge.

The North Carolina Rate Bureau ("Bureau") appeals from an order entered by the North Carolina Commissioner of Insurance ("Commissioner") that denied the Bureau's request for an adjustment in automobile insurance rates. The Bureau asserts four arguments on appeal: (1) the Commissioner improperly considered investment income on capital and surplus funds while deriving his underwriting profit provisions; (2) the Commissioner did not give due consideration to dividends and deviations; (3) the Commissioner overstated the amount of investment income generated from policyholder-supplied funds; and (4) the Commissioner improperly substituted his own ratemaking procedure. After careful review of the record, briefs and arguments of counsel, we discern no error and affirm the Commissioner's order.

The Bureau is a statutorily created entity. The Bureau was created by the General Assembly to replace and assume the duties of the North Carolina Automobile Rate Administrative Office, the North Carolina Fire Insurance Rating Bureau, and the Compensation Rating and Inspection Bureau of North Carolina. G.S. § 58-36-1(1) (2001). The Bureau is not an agency of the State. *See Allstate Ins. Co. v. Lanier*, 242 F. Supp. 73 (E.D.N.C. 1965), *aff'd*, 361 F.2d 870 (4th Cir.), *cert. denied*, 385 U.S. 930, 17 L. Ed. 2d 212 (1966). It represents the companies that sell automobile insurance in North Carolina, along with other types of insurers. *See* G.S. § 58-36-1(1).

The Commissioner of Insurance is an elected official of the State of North Carolina. G.S. § 58-2-5 (2001). The Commissioner's duties as chief officer of the Department of Insurance are broadly described as "the execution of laws relating to insurance." G.S. § 58-2-1 (2001). The North Carolina Supreme Court has listed the Commissioner's duties as follows:

> [F]aithfully executing all laws governing insurance companies and the authority to adopt rules to enforce that law; preventing practices injurious to the public; furnishing the necessary forms for statements required by companies, associations, orders, or bureaus; reporting to the Attorney General any violations of law relating to insurance companies; instituting civil actions or criminal prosecutions for violations of the insurance statutes; giving a statement or synopsis of any insurance contract upon proper application by any citizen; administering all oaths required in the discharge of his official duty; compiling and making available to

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

the public the lists of rates charged, including explanations of coverages provided by insurers; and adopting rules governing what constitutes an uninsurable facility.

*State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 350 N.C. 539, 541, 516 S.E.2d 150, 151 ("1996 Auto") (citing G.S. § 58-2-40), *reh'g denied*, 350 N.C. 852, 539 S.E.2d 11 (1999).

An insurance company may write insurance in North Carolina only after it has become a member of the Bureau. G.S. § 58-36-5 (2001). The Bureau files a rate change proposal with the Commissioner on behalf of its member companies. G.S. § 58-36-1(3) (2001). Any rate change must be approved by the Commissioner. G.S. § 58-36-70(a) (2001). If the Commissioner does not approve the Bureau's proposed rates, the Commissioner may set the insurance rates according to statute. G.S. § 58-36-70(d) (2001); *see* G.S. § 58-36-10 (2001).

After the Commissioner enters an order that rejects the Bureau's ratemaking structure, the Bureau may appeal to this Court. G.S. §§ 58-2-80, 58-36-25 (2001). The two most recent filings by the Bureau have resulted in appeals to this Court and the Supreme Court. The disagreement between the Bureau and the Commissioner regarding the legal significance of the two previous appeals forms the basis for the current appeal.

The Bureau filed a rate adjustment request for automobile insurance on 1 February 1994. The Commissioner entered an order on 28 September 1994 rejecting the Bureau's rates and substituting a different schedule of rates. The Bureau appealed to this Court. In an opinion dated 17 December 1996, this Court remanded the case to the Commissioner with instructions to modify his order. The Commissioner issued a new, modified order on 10 September 1997. The 10 September 1997 order was reversed on appeal to this Court on 29 December 1998.

While the 1994 filing proceeded on appeal, the Bureau filed for another rate change on 1 May 1995. The Bureau amended its filing on 1 April 1996. After hearings in July and August 1996, the Commissioner disapproved the Bureau's rate proposal. By orders issued on 4 October 1996 and 31 October 1996 the Commissioner lowered rates for car insurance by 8.3% and raised the motorcycle insurance rates by 3.2%. In an opinion filed on 16 June 1998, this Court reversed the Commissioner's orders in part and affirmed in part. The

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

Supreme Court affirmed the Court of Appeals' opinion on 25 June 1999. Both the 1994 and 1996 rate filing disputes were eventually settled by the parties.

The Bureau filed the requested rate change at issue here on 1 May 2001. The filing requested an increase of 10.6% for private passenger automobile rates and a decrease of 2.4% for motorcycle rates. The Commissioner held a hearing on the matter from 25 September 2001 until 31 October 2001. The Bureau's filing was over 1,000 pages in length. The evidence included nearly seventy exhibits, testimony from nine expert witnesses and four additional witnesses. The Commissioner rejected the Bureau's requested rates in his order dated 14 December 2001. Instead, the Commissioner ordered a rate reduction of 13.0% for automobile rates and a reduction of 15.9% for motorcycles. The Bureau appeals from this order.

When reviewing an order by the Commission, this Court "must examine the whole record and determine whether the Commissioner's conclusions of law are supported by material and substantial evidence." *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 129 N.C. App. 662, 664, 501 S.E.2d 681, 684 (1998) ("1996 Auto-COA"), *aff'd*, 350 N.C. 539, 516 S.E.2d 150 (1999). "The whole record test requires the reviewing court to consider the record evidence supporting the Commissioner's order, to also consider the record evidence contradicting the Commissioner's findings, and to determine if the Commissioner's decision had a rational basis in the material and substantial evidence offered." *State ex rel. Comr. of Ins. v. Rate Bureau*, 124 N.C. App. 674, 678, 478 S.E.2d 794, 797 (1996) ("1994 Auto") (quoting *State ex rel. Comr. of Insurance v. N.C. Rate Bureau*, 75 N.C. App. 201, 208, 331 S.E.2d 124, 131, *disc. rev. denied*, 314 N.C. 547, 335 S.E.2d 319 (1985) ("1983 Farm")), *disc. rev. denied*, 346 N.C. App. 184, 486 S.E.2d 217 (1997). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' It is 'more than a scintilla or a permissible inference.' " *1994 Auto*, 124 N.C. App. at 678, 478 S.E.2d at 797 (citations omitted) (quoting *Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 205, 214 S.E.2d 98, 106 (1975)).

The Commissioner determines the weight and sufficiency of the evidence presented during the hearing, including the credibility of any witnesses. *See State ex rel. Comr. of Insurance v. N. C. Rate Bureau*, 96 N.C. App. 220, 221, 385 S.E.2d 510, 511 (1989) ("1987 Workers' Compensation"). "[I]t is not our function to substitute our judgment for that of the Commissioner when the evidence is con-

flicting." *1987 Workers' Compensation*, 96 N.C. App. at 221, 385 S.E.2d at 511. Instead, the Commissioner's order is presumed correct if it is supported by substantial evidence. G.S. §§ 58-2-80 and 58-2-90(e) (2001). The order must conform to the guidelines set out in G.S. § 58-36-10:

> (1) Rates or loss costs shall not be excessive, inadequate or unfairly discriminatory.

> (2) Due consideration shall be given to actual loss and expense experience within this State for the most recent three-year period for which that information is available; to prospective loss and expense experience within this State; to the hazards of conflagration and catastrophe; to a reasonable margin for underwriting profit and to contingencies; to dividends, savings, or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members, or subscribers; to investment income earned or realized by insurers from their unearned premium, loss, and loss expense reserve funds generated from business within this State; and to all other relevant factors within this State: Provided, however, that countrywide expense and loss experience and other countrywide data may be considered only where credible North Carolina experience or data is not available.

G.S. § 58-36-10. As long as the Commissioner's order meets the criteria of G.S. § 58-36-10 and is supported by material and substantial evidence, the order should be upheld.

I.

[1] The Bureau first argues that the Commissioner improperly considered investment income from capital and surplus funds while calculating the ordered insurance rates. In order to analyze the Bureau's argument, we must first look at the structure of the insurance industry and the holdings of the *1994 Auto* and *1996 Auto* cases. *See 1996 Auto*, 350 N.C. 539, 516 S.E.2d 150 (1999); *1994 Auto*, 124 N.C. App. 674, 478 S.E.2d 794 (1996).

An insurance company's total profit is derived from two distinct parts of the insurance business—(1) profit earned by the insurance operations and (2) profits earned by investing capital and surplus funds. The profit from insurance operations includes both the underwriting profit and investment income from policyholder-supplied funds. The underwriting profit can be defined as the difference

between insurance premiums collected and the amount the company pays out for losses and expenses. Policyholder-supplied funds are the amount of premiums paid to the insurance company. Policyholder-supplied funds are usually invested during the insurance coverage period.

The investment income produced by policyholder-supplied funds should be given due consideration during the ratemaking process. *See* G.S. § 58-36-10(2). The underwriting profit portion has been the traditional focus of the dispute between the Commissioner and the Bureau. In past orders, the Commissioner improperly considered investment income from capital and surplus funds. *See 1996 Auto*, 350 N.C. 539, 516 S.E.2d 150 (1999); *1994 Auto*, 124 N.C. App. 674, 478 S.E.2d 794 (1996).

In addition to the statutory structure, this Court and the Supreme Court have placed additional requirements upon the ratemaking process:

> Three basic principles of law pertain to the setting of insurance rates: (1) the Commissioner must set rates that will produce a fair and reasonable profit and no more; (2) what constitutes a fair and reasonable profit 'involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk'; and (3) the underwriting business, which includes the collection and investment of premiums, is the only basis for calculating the profit provisions.

*1996 Auto*, 350 N.C. at 541, 516 S.E.2d at 151 (citations omitted) (quoting *In re N.C. Fire Ins. Rating Bureau*, 275 N.C. 15, 39, 165 S.E.2d 207, 224 (1965)). In the orders that gave rise to the *1994 Auto* and *1996 Auto* appeals, the Commissioner defined "business ventures of comparable risk" as the total profit of the insurance industry. In order to set a rate equal to comparable businesses in those orders, the Commissioner subtracted capital investment income and investment income from policyholder-supplied funds from total returns to reach the underwriting profit:

> Total profits of the industry
>
> - capital/surplus investment income
>
> = profits from insurance operations.

Profits from insurance operations

- income from policyholder-supplied funds

= underwriting profit.

Both orders (1994 and 1996) were reversed because the Commissioner improperly considered the investment income on capital and surplus funds. *See 1996 Auto*, 350 N.C. at 545, 516 S.E. 2d at 153-54 ("This Court has made it clear that unless the legislature changes the law, investment income from capital and surplus cannot be considered when setting insurance rates.") and *1994 Auto*, 124 N.C. App. at 686, 478 S.E.2d at 802 ("The formula used must exclude investment income earned on capital and surplus."). The Supreme Court prohibited the Commissioner from including capital and surplus income in the ratemaking formula because "[i]n determining whether an insurer has made a reasonable profit, the amount of business done rather than its capital should be considered . . . ." *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 444, 269 S.E.2d 547, 586 (1980) ("1977 Auto") (quoting 2 Ronald A. Anderson, *Couch Cyclopedia of Insurance Law* § 21:38 (2d ed. 1959)). Here, the Bureau argues that the Commissioner has committed the same error in his 2001 order as he did in the 1994 and 1996 orders. We disagree.

In the 2001 order, the Commissioner altered his ratemaking formula in one significant way. Rather than attempting to find a total return, the Commissioner set the return on insurance operations as his target. The Commissioner made the following pertinent findings of fact:

150. The Bureau proposes a return on operations equivalent to a target total return. A target total return is an appropriate return for the whole of an insurance company taking into account investment income from capital and surplus.

151. The Bureau's target total return is a range of 13.1% to 15.3% and is based upon the cost of capital with the addition of a .49% market to book conversion factor. [Expert witness] Appel indicates that the law in North Carolina allows for a return on operations in this range.

152. The Bureau uses a cost of capital as a measure of the returns that other businesses of comparable risk can earn in the market. However, the returns that the cost of capital measures are the returns those other businesses earn from all sources of

income. Thus, the cost of capital is a total return, which in the insurance industry includes consideration of income from capital and surplus.

153. Department witnesses Cohn, Schwartz and D'Arcy testify that the Bureau's total return includes investment income on capital and surplus by virtue of the cost of capital calculation, described more fully below.

. . . .

156. In other jurisdictions, setting the cost of capital as the target return is appropriate; however, other jurisdictions may consider all sources of income in calculating profit. In North Carolina, only one source of income, the insurance operations, may be considered, while the investment income from capital and surplus may not.

. . . .

159. Miller indicates that the law in North Carolina is unique in that insurers are allowed a return on operations which, in other States, would be equivalent to the return on operations plus the return on capital and surplus. Miller's statement, thus, substantiates the Department's claims that the Bureau's return includes consideration of investment income on capital and surplus.

. . . .

161. In addition to the Bureau's consideration of investment income from capital and surplus in setting the target return, the Bureau's target return is excessive. In calculating the total return as the target, the Bureau is setting the return for the insurance operations alone (which is a partial return) commensurate with the total returns of other businesses, including the insurance business. This is simply not "comparable" as required by law.

162. The lack of "comparability" is evidenced by the Bureau's prospective range of returns of 13.1% to 15.3% compared to the average pre-tax historical returns on insurance operations during an eighteen year period of the countrywide property/casualty industry of approximately 3.7% and the ten year average pre-tax returns in competitive rating states of 4.3% liability and 6.4% physical damage. This lack of "comparability" is further evidenced by the resulting profit provisions of 9.5% and 14.0%,

which are higher than several of the witnesses have ever encountered in any jurisdiction and certainly higher than the profit provisions recently utilized by the top ten writers in three neighboring states.

163. In contrast to the Bureau, the Department witnesses calculate a return on operations taking into consideration only the income generated by the insurance activity.

164. The Department witnesses' recommended returns are compared to the risk or operational returns (partial returns) of businesses of comparable risk.

165. The returns which the Department witnesses propose range from pre-tax returns of 4.3% to 4.5% for liability and 3.5% to 6.4% for physical damage to post tax returns of 3.7% to 6.8% for liability and 4.3% to 6.8% for physical damage.

166. The Department witnesses recommend a return on operations that is not a total return because North Carolina law requires that profit be set on the insurance operations only and that profit from the investment business not be considered. Furthermore, a return on operations that is not a total return provides the proper comparison to businesses of comparable risk.

167. Unlike the Bureau, the Department witnesses did not recommend a target total return because: (1) a total return includes consideration of investment income from capital and surplus; (2) calculating a return for only one source of insurance industry income based upon the returns generated by all sources of income of other businesses does not constitute "comparable risk," as required by the law of this State.

168. The evidence in this case is overwhelming that it is impossible to calculate a target total return without considering investment income on capital and surplus.

169. In an attempt to circumvent the illegality of including investment income from capital and surplus in the calculation of the target rate of return, Bureau witness Appel states that the prohibition against considering investment income from capital and surplus applies only to the calculation of the profit provisions, not to the establishment of a target rate of return. However, there is absolutely no legal foundation for this con-

tention and the recent North Carolina Supreme Court decision in the 1996 case states otherwise.

170. Based upon the material and substantial evidence in this case, the Commissioner finds that the appropriate target rate of return in this case is a return on operations which is not equivalent to a total return. A total return requires consideration of investment income from capital and surplus which violates the ratemaking laws of this State. Furthermore, a total return makes an inappropriate comparison to businesses that are not of comparable risk, which leads to excessive returns. For those reasons, the Bureau's target range of returns is herein rejected.

(Internal citations omitted.) In this order, the Commissioner focused on the return on insurance operations as the appropriate target for his calculations. In order to compare the insurance operations return to an industry of comparable risk, the Commissioner relied upon an expert opinion by Department witness Allan I. Schwartz. Schwartz testified that the eighteen year average return on insurance operations for the property and casualty insurance industry was 3.7%. Schwartz adjusted his estimate of the return on operations in order to account for the slight difference in risk between the property and casualty industry and the private passenger automobile insurance industry. The Bureau has not argued that this property and casualty industry information is not indicative of an industry of comparable risk. Indeed, we note that the Bureau's own expert, Dr. James H. Vander Weide, used property and casualty industry information when formulating his expert opinion. G.S. § 58-36-10(2) does not require the Commissioner or any expert witness to use only three years of North Carolina data when calculating the reasonable margin of underwriting profit. Those geographical and temporal restrictions only apply to the consideration of the loss and expense experience, which is not in dispute here. As a result, we hold that the evidence regarding the eighteen year average return on insurance operations is "more than a scintilla or a permissible inference" that sufficiently supports the Commissioner's setting of rates.

In addition, we find the Bureau's argument that the Commissioner must set his target as the total rate of return to be unpersuasive. No statute or any case has required the Commissioner to focus on the total rate of return for the insurance industry. Instead, previous appellate court opinions have declared that the return on operations is the only portion of income the Commissioner can consider during the ratemaking process. If the Commissioner had compared

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

total returns here, as he did in previous ratemaking orders, the Commissioner would have been required to add capital and surplus funds somehow. By using insurance operations as the comparable industry, the Commissioner did not need to consider investment income on capital and surplus funds. Accordingly, the investment income on capital and surplus funds has not been used in the 2001 ratemaking calculation. The Commissioner's underwriting profit provision comports with the requirements of G.S. § 58-36-10 as well as the holdings of *1994 Auto* and *1996 Auto*. We conclude there is substantial evidence to support the Commissioner's findings of fact and conclusions of law on this issue. Therefore this assignment of error is denied.

## II.

[2] The Bureau next argues that the Commissioner failed to give due consideration to the impact of policyholder dividends and rate deviations in his ratemaking calculations. We disagree.

Policyholder dividends are a return of premiums to insurance purchasers, much like a rebate. Policyholders pay premiums at the manual rate, then receive a rebate or "dividend" at the end of the policy term. *See* G.S. § 58-36-60 (2001). The manual rate is set by the Commissioner through the ratemaking process and is the rate insurance companies must charge customers unless a deviation is allowed. Rate deviations occur when a company receives permission to charge certain policyholders more or less than the manual rate. *See* G.S. § 58-36-30 (2001). If a policyholder is given a rate deviation, the policyholder pays less than the manual rate from the beginning of the policy period.

The Bureau contends that dividends and deviations are a necessary tool for competition among insurance companies. Without deviations or dividends, the Bureau argues that insurance companies could not attract "good risk" policyholders. According to its argument, dividends and deviations are not profits. The Bureau believes that an adjustment of 5.0% should be included as a separate term in the ratemaking calculation in order to counteract the effect of dividends and deviations. Without this provision, the Bureau argues that a premium shortfall will occur. This argument is unpersuasive.

Due consideration of policyholder dividends and rate deviations is required by statute. *See* G.S. § 58-36-10(2) ("Due consideration shall be given . . . to dividends, savings or unabsorbed premium deposits

allowed or returned by insurers to their policyholders, members, or subscribers."). The *1994 Auto, 1996 Auto-COA*, and *1996 Auto* cases are also instructive on this issue because the treatment of dividends and deviations was considered in those appeals.

The ratemaking formula is not required to contain an explicit adjustment for dividends and deviations in order to prove due consideration was given to them. *See 1996 Auto*, 350 N.C. at 547, 516 S.E.2d at 154-55 (" '[D]ue consideration' does not require that a numerical adjustment of the rates be made in order to reflect the effects of dividends and deviations."); *1996 Auto-COA*, 129 N.C. App. at 667, 501 S.E.2d at 686; *1994 Auto*, 124 N.C. App. at 681, 478 S.E.2d at 799. It has also been held that dividends and deviations can be treated as profits rather than as expenses. *1996 Auto-COA*, 129 N.C. App. at 668, 501 S.E.2d at 686 (citing *1994 Auto*, 124 N.C. App. at 682, 478 S.E.2d at 800). The Bureau's arguments contradict these established guidelines and are therefore overruled.

The Commissioner made the following pertinent findings of fact regarding dividends and deviations:

406. The Commissioner finds and concludes that any margin for the payment of dividends and deviations in excess of the margin provided for in the average manual premium is unreasonable and produces rates that are excessive and unfairly discriminatory.

407. Based on the foregoing, the Commissioner finds that an average manual rate with profit provisions of -2.8% for liability and +1.0% for physical damage will provide approximately 4.5% to 5.0% of manual premiums, or approximately $120-135 million, as savings that may be used to pay dividends and to grant deviations to insureds, assuming the same book of business.

408. The approximately 4.5% to 5.0% of premium or approximately $120-135 million provided in the manual rate for policyholder dividends and deviations by the Bureau member companies is reasonable, adequate and is provided in the rates, which are adopted and approved herein by this Order and which are not inadequate, excessive, or unfairly discriminatory.

409. Dividends and deviations in excess of the approximately 4.5% to 5.0% of premium or approximately $120-135 million may occur, as in the past. If so, the excess may come from companies which are prepared to accept, on an individual basis,

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

less than the average profit provided in the manual rate, from accumulated surplus, from lower expenses, from an excessive rate level implemented by the Bureau or from sources which are not within the jurisdiction of the Commissioner.

410. This approximately 4.5% to 5.0% of premium will become retained earnings, i.e., profit, if it is not distributed as dividends and deviations. Including more than the 4.5% to 5.0% of premium that comes from savings for dividends and deviations in the rate calculation will cause rates to spiral and become excessive and unfairly discriminatory.

The Commissioner also found that dividends and deviations are transfer payments or profit. The Commissioner found that including a specific provision for dividends and deviations was unnecessary because the use of an average rate implicitly included consideration of dividends and deviations. After careful review, we conclude that there is sufficient record evidence to support the Commissioner's findings.

The Commissioner's reasons for refusing to adjust the ratemaking formula by adding a provision for dividends and deviations are twofold. First he states that dividends and deviations should not be added to the rate because they are already included within the computation of the average rate. The average rate takes into account the companies that deviate as well as those that do not deviate. Similarly, the average is already reduced by those companies that provide dividends. Any explicit provision would double-count dividends and deviations, which would lead to "spiraling"—a rise in insurance rates. In addition, the Commissioner finds that dividends and deviations are part of profit, instead of an expense for insurance companies. Since a provision for profit already exists, adding an additional provision in the ratemaking formula for these types of profit is redundant.

We hold that the Commissioner's findings of fact are based upon substantial and competent evidence. The Commissioner's findings of fact indicate that the insurance industry will have approximately 4.5% to 5.0% profit to use for dividends and deviations if they choose to do so. The Commissioner's finding that dividends and deviations are profit is based upon the opinion that these are monies voluntarily surrendered by the insurance companies. Treatment of dividends and deviations as profit has been approved by this Court before. *See 1996 Auto-COA*, 129 N.C. App. at 668, 501 S.E.2d at 686 (citing *1994 Auto*, 124 N.C. App. at 682, 478 S.E.2d at 800). In addition, designating divi-

dends and deviations as "profit" and failure to adjust the ratemaking formula with a specific provision for them does not mean that the due consideration required by statute has been denied. Here, the Commissioner listed each expert witness's treatment of dividends and deviations in his findings of fact. The Commissioner then stated why he found one expert's opinion more persuasive than the others, and why he chose to treat dividends and deviations as he did. We note again that the Commissioner is not required to numerically adjust the rates to show that he has provided due consideration of any of the factors in G.S. § 58-36-10. *See 1996 Auto*, 350 N.C. at 547, 516 S.E.2d at 154-55. Here, this technique of analysis indicates that the Commissioner provided due consideration to dividends and deviations as required by G.S. § 58-36-10.

The Bureau's arguments regarding competition and premium shortfalls are essentially arguments that dividends and deviations should not be treated as profit. We reject these arguments for the reasons stated above.

The Bureau also argues that the Commissioner's order should focus on the aggregate industry rather than the average company. The Bureau cites the following:

> The statute contemplates that the rates shall be fixed with a view of the aggregate earnings and profits for the insurance business in the State. Each company may make as much money as it can. Some may make enormous profits, some may do a losing business, but the average profit, that is, the average profit on the aggregate business, must be reasonable.

*1977 Auto*, 300 N.C. 381, 444-45, 269 S.E.2d 547, 586 (1980) (quoting *Aetna Ins. Co. v. Hyde*, 285 S.W. 65 (Mo. 1926), *cert. dismissed*, 275 U.S. 440, 72 L.Ed. 357 (1928)). Here, the Commissioner chose to analyze the issue of dividends and deviations from the standpoint of an "average" insurance company. However, his conclusions and findings also discussed the effect of the average rate on the industry and the overall aggregate profit of the industry. Therefore, assuming that the *1977 Auto* case requires the Commissioner to consider the effect of the average rate on the industry and the overall aggregate profit of the industry, he has done so according to the order.

After careful review of the record, we hold that the Commissioner's findings and conclusions were adequately supported by the evidence and do not produce an excessive, inadequate or

unfairly discriminatory rate. Accordingly, this assignment of error is overruled.

## III.

[3] The Bureau also contends that the Commissioner improperly calculated the investment income available from policyholder-supplied funds. The Commissioner found that rate deviations should not be included in the calculation of the investment of policyholder-supplied funds. The Commissioner also found that no reduction in investment income should be included to account for agents' balances and prepaid expenses. We conclude that sufficient evidence supports the Commissioner's findings and conclusions.

As the Commissioner stated in his findings, investment income is dependent upon three factors: (1) the amount of money invested, (2) the length of time the funds are invested, and (3) the rate of return. Here, the Bureau disputes the Commissioner's decision regarding the first two factors—the amount invested and the duration of the investment. The Bureau argues that rate deviations reduce the amount of premiums that insurance companies are able to invest. The Commissioner calculated the amount of money available for investment without reducing that amount to account for rate deviations. The Commissioner based his calculation upon the testimony of Department of Insurance's expert witness Schwartz. Also, the Commissioner considered deviations within his calculation of the underwriting profit provision. If rate deviations were also considered within the investment income from policyholder-supplied funds portion of the equation, deviations would be counted twice. This double-counting would produce an excessively high rate of return on insurance operations according to the Commissioner's ratemaking formula. Therefore we hold that the Commissioner's refusal to reduce investment income from policyholder-supplied funds in order to consider rate deviations is supported by material and substantial evidence.

The Bureau also faults the Commissioner's refusal to reduce the estimated investment income projection as a result of agents' balances and prepaid expenses. Agents' balances occur when insurance policyholders pay for their coverage in installment payments throughout the policy term. "Prepaid expenses" refers to the insurance companies' practice of paying expenses from their reserve funds before the policy premiums are paid by consumers. The Bureau argues that agents' balances and prepaid expenses negatively affect

overall investment income. Both agents' balances and prepaid expenses reduce the amount of time policyholder-supplied funds are invested. The Commissioner based his calculations on the assumption that the insurance company would have the full manual rate premium over the entire coverage period. The Commissioner found that his treatment of agents' balances and prepaid expenses was consistent with the testimony of expert witnesses Cohn and Schwartz. In addition, the Commissioner stated that his calculations were consistent with the calculations used to set rates that were examined in the *1994* and *1996 Auto* opinions.

In *1994 Auto*, this Court wrote:

Section F of the Commissioner's order examined the issue of investment income from unearned premium, loss, and loss expense reserve funds [or "policyholder-supplied funds"]. In this section, the Commissioner clearly defined the factors involved in considering investment income; selected a reasonable rate of return (7%) on investments; and carefully explained why he concluded the Bureau's amount of reserves subject to investment was incorrect.

*1994 Auto*, 124 N.C. App. at 691, 478 S.E.2d at 805. Here, the Commissioner summarized the evidence given by the expert witnesses on both sides of the dispute. The Commissioner noted that two expert witnesses had adopted his treatment of agents' balances and prepaid expenses from the *1994* and *1996 Auto* cases. Then the Commissioner summarized his method of calculating investment income on policyholder-supplied funds in the previous orders. After finding that the Bureau had not offered new evidence on this matter, the Commissioner found that his calculation in the 2001 order was identical to the one approved by this Court in the earlier filing. Adopting the reasoning of this Court in *1994 Auto*, the Commissioner found that:

433. The policy reason for disallowing deductions for agents' balances and prepaid expenses is that, unlike the customary consumer transactions, in an insurance transaction the policyholder must pay for the insurance benefit in advance of the service provided. This pre-payment of premiums allows the insurance companies to invest this unearned revenue for profit. For this reason, policyholders, should, in the ratemaking process, receive the full benefit of income that results from investing policyholder funds.

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

*Also see 1994 Auto*, 124 N.C. App. at 691, 478 S.E.2d at 805. The Commissioner also repeated this Court's finding that agents' balances and prepaid expenses were within the control of the individual insurance companies and should not impact the ratemaking process in a way that disadvantages consumers. We conclude that there is substantial evidence in the record to support the Commissioner's calculation of investment income from policyholder-supplied funds.

IV.

[4] The Bureau's final argument on appeal is that the Commissioner erred by substituting his ratemaking procedure without first finding that the Bureau's procedure would produce excessive, inadequate or unfairly discriminatory rates. We disagree.

The Bureau takes exception to the Commissioner's rejection of its data set. The Bureau's calculations were based upon one year of data that met certain reliability standards. The Bureau had used the one year data set in previous filings without objection from the Commissioner. However, here the Commissioner chose to use a three-year average data set instead. The Commissioner found that "[t]he use of three years of data will produce rates that are neither inadequate, excessive or unfairly discriminatory." The Commissioner did not find that the Bureau's data would produce excessive, inadequate or unfairly discriminatory rates. The Bureau contends that without this specific finding regarding its data, the Commissioner could not substitute his own data set. This argument is not persuasive.

G.S. § 58-36-10(1) states that "[r]ates or loss costs shall not be excessive, inadequate or unfairly discriminatory." "If the Commissioner after the hearing finds that the filing does not comply with the provisions of this Article, he may issue an order disapproving the filing, determining in what respect the filing is improper, and specifying the appropriate rate level or levels that may be used . . . ." G.S. § 58-36-70(d). These two statutes focus upon the propriety of the entire filing instead of specific parts of the filing. As a result, we hold that the Commissioner is not required to find each portion of the Bureau's filing improper before he can substitute his own ratemaking structure. Instead, the plain language of G.S. § 58-36-70(d) indicates that the Commissioner must analyze the entire rate filing to determine whether the overall calculation will result in excessive, inadequate or unfairly discriminatory insurance rates. Therefore, it was not necessary for the Commissioner to find that the data set used by

the Bureau would produce a calculation that created rates that were excessive, inadequate or unfairly discriminatory. The Commisioner, in order to use his own data or calculations, or to set rates, must only conclude that the Bureau's filing as a whole would result in excessive, inadequate or unfairly discriminatory rates. Here, the Commissioner concluded:

II. Inasmuch as the Bureau has failed to give due consideration to the factors set forth in Conclusions of Law, Part I, the Bureau's proposed rate level increase for private passenger cars of ten and six tenths percent (+10.6%) is excessive and unfairly discriminatory for the reasons set forth in Findings Part I through Part VI and elsewhere in this Order, which are incorporated herein by reference. Accordingly, the Bureau's request for a rate increase of ten and six tenths percent (+10.6%) is denied and the filing is disapproved.

Because the Commissioner's conclusion was adequately supported by material and substantial evidence, this assignment of error is overruled.

V.

After careful review of the record, we hold that the Commissioner's order establishes a rate level that is not inadequate, excessive or unfairly discriminatory. The Commissioner appropriately considered the factors outlined in G.S. § 58-36-10 and applied his discretion according to the limits of the *1994 Auto* and *1996 Auto* opinions. The Commissioner's findings of fact are supported by material and substantial evidence. For the foregoing reasons, the Commissioner's order setting automobile and motorcycle liability insurance rates is affirmed.

Affirmed.

Judge STEELMAN concurs.

Judge TYSON dissents.

TYSON, Judge dissenting.

I respectfully dissent from the majority's opinion.

## I. Issue

The issue before this court is whether the Commissioner's order is supported by material and substantial evidence where the expert witness, whose opinion the Commissioner relied upon to support his findings of fact, ignored and expressly excluded consideration of statutorily required factors.

## II. Standard of Review

On judicial review, this Court employs the "whole record test" to determine whether material and substantial evidence supports the findings of fact and conclusions of law of the Commissioner. *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau (1996 Auto)*, 350 N.C. 539, 547, 516 S.E.2d 150, 155, *reh'g denied*, 350 N.C. 852, 539 S.E.2d 11 (1999). "The whole record test requires the reviewing court to consider the record evidence supporting the Commissioner's order, to also consider the record evidence contradicting the Commissioner's findings, and to determine if the Commissioner's decision had a rational basis in the material and substantial evidence offered." *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 124 N.C. App. 674, 678, 478 S.E.2d 794, 797 (1996). The Commissioner's order, if supported by substantial and material evidence, is presumed to be correct and proper. *1996 Auto*, 350 N.C. at 547, 516 S.E.2d at 155. This Court should not substitute its judgment for that of the Commissioner's when the evidence is conflicting. *Id.* at 548, 516 S.E.2d at 155.

The record shows that the Commissioner's findings of fact fail to conform to these requirements and are not supported by substantial and material evidence in the whole record. The order failed to meet the requirements of N.C. Gen. Stat. § 58-36-10.

## III. Reliance on Countrywide Loss and Expense Experience

The Bureau asserts in their first assignment of error, that the Commissioner relied on expert testimony that does not compare returns on insurance operations in North Carolina to industries of comparable risk in North Carolina. ·

N.C. Gen. Stat. § 58-36-10 (2001) requires:

(2) Due consideration *shall* be given to actual loss and expense experience within *this State* for the most recent *three-year period* for which that information is available . . . Provided, however, that countrywide expense and loss experience and other

countrywide data may be considered *only* where credible North Carolina experience or data is not available.

(emphasis supplied).

The statute requires that the Commissioner "shall" consider North Carolina data over the most recent three-year period in making his findings of fact. N.C. Gen. Stat. § 58-36-10(2) (2001). The Commissioner may consider countrywide data "*only*" if he finds that the North Carolina data is not "credible" or "available." *Id.*

When finding returns on insurance operations, the Commissioner primarily relied on the expert opinion of the department's witness Allan I. Schwartz ("Schwartz"). Schwartz testified that the eighteen year average return on countrywide insurance operations for the property and casualty insurance industry was 3.7%. He further testified that property/casualty risks are lower than the risks associated with automobile liability. Relying on this testimony, the Commissioner made the following finding of fact:

162. The lack of "comparability" is evidenced by the Bureau's prospective range of returns of 13.1% to 15.3% compared to the average pre-tax historical returns on insurance operations during an *eighteen year period* of the *countrywide* property/casualty industry of approximately 3.7% and the *ten year average* pre-tax returns in *competitive rating states* of 4.3% liability and 6.4% physical damage. This lack of "comparability" is further evidenced by the resulting profit provisions of 9.5% and 14.0%, which are higher than several of the witnesses have ever encountered in any jurisdiction and certainly higher than the profit provisions recently utilized by the top ten writers in three *neighboring states*.

(emphasis supplied). The Commissioner had previously and expressly found that the North Carolina data required to be considered by the statute was credible and available. The Commissioner made the following findings of fact:

85. N.C. Gen. Stat. § 58-36-10 does require due consideration of the latest three years of data, that data *is available* in the filing for all three years and, according to the Bureau's credibility standards, all three years *are fully credible*. There doesn't appear to be any reason, therefore, for all three years not to be used. In fact, there appears to be a number of reasons why three years of data should be used in the rate calculations . . . .

STATE ex rel. COMM'R OF INS. v. N.C. RATE BUREAU

[160 N.C. App. 416 (2003)]

86. Therefore, based on the evidence in this case, the Commissioner finds that use of the three year unweighted average of the indications for the years 1997-1999 is the appropriate way to provide due consideration of the latest three years of experience for the bodily injury, property damage, medical payments, comprehensive and collision coverages. The use of three years of data will produce rates that are neither inadequate, excessive or unfairly discriminatory.

(emphasis supplied).

In spite of these findings, the Commissioner relied on *country-wide* data from the property/casualty industry sector and data from neighboring states to set the overall return on operations at Schwartz's calculation of 3.7%. Schwartz admitted in his testimony that property and casualty risks were lower than automobile liability risks. Schwartz testified that "[p]roperty and casualty insurance companies are better than average (lower risk) for beta, safety and price stability, and lower than average (higher risk) for earnings predictability. Overall, the property and casualty insurance industry is of about average or somewhat below average risk."

The Commissioner also considered data from the past eighteen years and failed to abide by the statutory time frame requiring data from the "most recent three-year period." N.C. Gen. Stat. § 58-36-10(2) (2001). By relying on countrywide data after finding that North Carolina data was "credible" and "available" and by relying upon data six times older than the "most recent three year period," the Commissioner's findings of fact failed to comply with the statutory requirements and do not support his conclusions. *Id.*

### IV. Due Consideration of Dividends and Deviations

### A. Zero Percent Factor

The Bureau also contends the Commissioner did not give "due consideration" to dividends and deviations.

N.C. Gen. Stat. § 58-36-10 (2001) requires: "(1) Rates or loss costs shall not be excessive, inadequate or unfairly discriminatory. (2) Due consideration shall be given . . . to *dividends, savings, or unabsorbed premium deposits* allowed or returned by insurers to their policyholders, members, or subscribers . . . ." (emphasis supplied). N.C. Gen. Stat. § 58-36-10(1) requires the Commissioner to determine whether the proposed rates will produce "a fair and reasonable profit and no more." *1996 Auto*, 350 N.C. at 542, 516 S.E.2d at 151.

In *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, Judge Johnson found "[t]he Commissioner . . . elected to assign a valuation of zero to dividends returned to policyholders and rate deviations." 102 N.C. App. 824, 404 S.E.2d 368, slip op. at 7 (May 7, 1991) (No. 9010INS864) (unpublished) (Judges, now Justices, Parker and Orr concurring); Rule 30(e)(3). This Court held:

> [t]he net result of the Commissioner's decision is that the calculated rates are completely unaffected by dividends and deviations. As we have carefully considered the Commissioner's findings of fact, calculations and conclusions of law, we are nonetheless unable to adopt his argument that by assigning zero values to both dividends and deviations, he has complied with existing case law.

*Id.* (citations omitted).

All evidence was presented to the Commissioner in the form of expert testimony. The Commissioner again relied on Schwartz's expert testimony. Schwartz testified that allowing dividends and deviations to be included as a factor in the rate decision, was against "good public policy" and would result in unfairly discriminatory rates. Schwartz also testified that on "public policy grounds . . . it is not appropriate to build an additional cost factor for dividends and deviations back into the manual rate level" and that "dividends and deviations should not be built back into the manual rate level . . . since that procedure would eliminate any savings . . . . " Relying on this testimony, the Commissioner's findings of fact applied a "zero percent factor" for dividends and deviations in setting the insurance rates.

Public policy in North Carolina is and has been set by the North Carolina Legislature. N.C. Gen. Stat. § 58-36-10(2) (2001) requires "[d]ue consideration shall be given . . . to dividends, savings, or unabsorbed premium deposits allowed" in setting rates. No specific number must be assigned to these factors. *1996 Auto*, 350 N.C. at 547, 516 S.E.2d at 154-55. However, there must be substantial evidence in the record to show that dividends and deviations were given "due consideration." *Id.* In *1996 Auto*, our Supreme Court found that the Commissioner's rates expressly included a 5% margin for dividends and deviations and held that substantial evidence supported the Commissioner's findings of fact regarding dividends and deviations. *Id.* at 548, 516 S.E.2d at 155. That case is distinguishable. Here, the Commissioner claims that he included a 4.5 to 5% margin as he did in

*1996 Auto*. However, unlike in *1996 Auto*, nothing in the Commissioner's order shows that this 4.5 to 5% margin was expressly included in the rates. The order simply states that the 4.5 to 5% margin is "implicit" in his calculations. In his dissent from the *1996 Auto* case, Chief Justice Mitchell stated:

> [T]he Commissioner is required to give each factor some weight and that this must be reflected in his order. Otherwise, a reviewing court is faced with an inadequate appellate record and must, as here, simply accept the Commissioner's conclusory statements that he has taken all of the statutory factors into account. It is not enough for the Commissioner to note in conclusory fashion that dividends and deviations crossed his mind when he was entering his order.

*Id.* at 549, 516 S.E.2d at 156. The majority opinion states:

> The weight to be given the respective factors is for the Commissioner to determine in the exercise of his sound discretion and expertise, but he may not arrive at his determination as to the propriety of the filing by shutting his eyes to experience shown by evidence of reasonably probative value. . . .

*Id.* at 547, 516 S.E.2d at 155, quoting *State ex rel. Comm'r of Ins. v. N.C. Fire Ins. Rating Bureau*, 292 N.C. 471, 488-89, 234 S.E.2d 720, 729-30 (1977). N.C. Gen. Stat. § 58-36-10(2) requires that the Commissioner "shall" give "due consideration" to dividends and deviations, not "implicit" inclusion.

### B. Classification of Dividends and Deviations

In their second assignment of error, the Bureau asserts error in the Commissioner's finding that dividends and deviations are "profits" to the Bureau's member companies rather than costs.

As previously noted, "[t]he whole record test requires the reviewing court to consider the record evidence supporting the Commissioner's order, to also consider the record evidence contradicting the Commissioner's findings, and to determine if the Commissioner's decision had a rational basis in the material and substantial evidence offered." *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 124 N.C. App. at 678, 478 S.E.2d at 797. The Commissioner relied on Schwartz's expert opinion and found that dividends and deviations were "profits" instead of costs for the Bureau's member companies. The Commissioner concluded that since a provision for

profit already existed, adding an additional provision in the ratemaking formula for these types of profit is redundant. The Commissioner based these findings on Schwartz's opinion that these dividends and deviations are a "voluntarily distribution based upon individual company management decisions." As Judge Johnson held in *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*:

> In addition, we are unprepared to adopt his finding that dividends and deviations are voluntary decisions of the member companies and cannot be guaranteed by the Rate Bureau or the Commissioner. To the extent that the Commissioner ignored dividends to policyholders and rate deviations in his calculations, the ordered underwriting profit provisions must be recalculated to reflect an adjustment for these rating criteria.

102 N.C. App. 824, 404 S.E.2d 368, slip op. at 7 (May 7, 1991) (citations omitted). The logic of that case applies equally here.

The Commissioner also found that including a specific provision for dividends and deviations was "unnecessary" because the use of an average rate "implicitly" included consideration of dividends and deviations. The Commissioner's findings that dividends and deviations are profits and not costs to the Bureau's member companies has no basis in fact. Treating dividends and deviations as profits and assuming a zero percent factor forces the Bureau's member companies to either: (1) absorb these costs, which causes the rates to be "inadequate," or (2) exclude higher risk policyholders who would otherwise qualify for the manual rate, which causes the rates to be "discriminatory." N.C. Gen. Stat. § 58-36-10(1) (2001).

### 1. Absorption of Costs by Bureau's Member Companies

The Commissioner set his rate based upon the "average" profit or return. The "average" or midpoint return places an equal number of policyholders in the risk pool on either side of the average. Lower risk policyholders demand and receive discounts or deviations from the manual rate from the Bureau's member companies. Deviations are discounts from the manual rates and are never paid by the policyholders. *1996 Auto*, 350 N.C. at 545, 516 S.E.2d at 154; *see* N.C. Gen. Stat. § 58-36-30 (2001). Dividends are, essentially, rebates returned to policyholders at the end of the policy period. *Id.*; *see* N.C. Gen. Stat. § 58-36-60 (2001). The reason the statute requires "due consideration" of discounts and deviations in setting rates is that both reductions from the manual rate are tools the Bureau's member companies

expend to attract and retain lower risk policyholders within the risk pool. *Id.* at 546, 516 S.E.2d at 154.

Retention of lower risk policyholders in the risk pool is the basis for the legislature's policy choice that dividends and deviations be given "due consideration" in setting rates. Without retention of lower risk policyholders in the risk pool, the relative risk of the pool to the insurer increases.

Expressly excluding or ignoring the costs of dividends and deviations to a zero percent factor in setting the manual rate causes the average risk of the pool to shift higher, destroys the equilibrium required by the statute, and makes rates "inadequate." N.C. Gen. Stat. § 58-36-10(1) (2001). Applying a zero percent factor excludes "due consideration" of dividends and deviations, shifts the average risk, and causes the relative risk of the pool to be 4.5 to 5.0% higher, without providing the insurer offsetting compensation for the higher risk. To disallow insurers from treating dividends and deviations as costs requires the companies to absorb this cost and to subsidize rates for higher risk drivers. This forces the insurer to absorb these costs on a pool that is riskier than "average," and makes the rates "inadequate." *Id.*

### 2. Exclusion of Higher Risk Policyholders

If insurers are not allowed consideration for dividends and deviations, they may seek to exclude higher risk drivers from manual rates who would have otherwise qualified. If otherwise qualified drivers are excluded from manual rates, this "zero percent factor" for dividends and deviations makes the rates "discriminatory." *Id.* Using a zero percent factor for dividends and deviations causes the relative risk of the pool of policyholders to be higher than the average risk of the pool. Higher risk policyholders, who would have otherwise qualified for manual rates, may be excluded from manual rates and be assigned to the reinsurance facility in order to restore balance to the risk pool. In this situation, if dividends and deviations are not treated as costs, rates become "discriminatory" against excluded policyholders, who would have otherwise qualified for manual rates. *Id.* The statute's requirement of "due consideration" to dividends and deviations reflects the General Assembly's public policy choice: (1) to provide affordable insurance coverage to the widest possible pool of drivers, at rates that are neither excessive, inadequate, or unfairly discriminatory and (2) to encourage efficient and economic practices for the purchase of liability insurance by all owners of vehicles oper-

ated on our highways. N.C. Gen. Stat. § 58.40-1 (2001); *also see generally* George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 Qu. J. Econ. 488, 488-90, 492-500 (1970) (2001 Nobel Laureate in Economics).

## V. Substantial Evidence to Support Findings of Fact

Judicial reviews of other North Carolina Commissions' orders have held that findings of fact are not supported by substantial evidence when the expert opinion, upon which these findings were based, ignored legally required factors. *Holley v. Acts, Inc.*, 357 N.C. 228, 581 S.E.2d 750 (2003); *In re Corbett*, 355 N.C. 181, 558 S.E.2d 82 (2002). *Holley* involved an appeal from the Industrial Commission granting a worker's compensation claim. Our Supreme Court held "when such expert testimony is based merely upon speculation and conjecture, . . . it is not sufficiently reliable to qualify as competent evidence . . . ." 357 N.C. at 232, 581 S.E.2d at 753. Our Supreme Court reversed the Industrial Commission and held that the expert opinion evidence, upon which the Industrial Commission relied to make its findings, failed to meet the "reasonable degree of medical certainty" standard required by law. *Id.* at 234, 581 S.E.2d at 754. Without expert testimony based upon legal requirements, no competent evidence supported the Industrial Commission's findings of fact. The Supreme Court reversed the Industrial Commission's decision. *Id.*

*In re Corbett* involved an appeal from the Property Tax Commission's order of value of real property. Our Supreme Court held that "based on statutory mandate, once it is determined that valuation or revaluation of a property is statutorily required, any valuation which is not made in accordance with the schedules, standards and rules used in the County's most recent general reappraisal or horizontal adjustment is in violation of the statutory requirements of section 105-287." 355 N.C. at 189, 558 S.E.2d at 87. Our Supreme Court stated "if the provisions of [the statute] are triggered, it necessarily follows that the *only* statutorily permissible method of valuation is through the application of the County's schedules, standards and rules." *Id.* at 185, 558 S.E.2d at 84. Our Supreme Court reversed and remanded because the expert witness did not follow the statutory requirements in formulating his opinion. *Id.* at 189, 558 S.E.2d at 87.

## VI. Conclusion

N.C. Gen. Stat. § 58-36-10 (2001) requires that the Commissioner's findings shall give "due consideration" to "credible" and "available" North Carolina data from the "most recent three year period" and to

dividends and deviations in setting rates. The Commissioner primarily relied on one expert's testimony, who not only ignored, but expressly excluded on "public policy grounds," these statutorily required factors in formulating his opinion. This expert witness also based his opinion on eighteen year old countrywide data after the Commissioner had found North Carolina data from the most recent three year period to be "credible" and "available." Schwartz's opinion testimony failed to comply with the statute and fails to provide substantial evidence to support the Commissioner's findings of fact. I would reverse and remand this case to the Commissioner to base his order on substantial evidence that includes "due consideration" to the General Assembly's statutory requirements. I respectfully dissent.